USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/10/2019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
    UNITED STATES OF AMERICA,

                    -against-

    PAUL J. MATHIEU,
                                   Defendant.
------------------------------------------------------------ X

16 Cr. 763 (LGS)

**OPINION AND ORDER**

LORNA G. SCHOFIELD, District Judge:

After a six-week jury trial, Defendant Paul J. Mathieu was convicted of conspiracy to commit health care fraud, mail fraud and wire fraud, conspiracy to make false statements relating to health care matters, and the substantive crimes of health care fraud, mail fraud and wire fraud. Defendant moves for a judgment of acquittal pursuant to Rule 29,[1] or in the alternative, seeks a new trial pursuant to Rule 33. For the reasons stated below, the motion is denied.

I. **Background**

    A. **Summary of the Government's Case**

At trial, the Government presented evidence that Defendant, a physician who is board certified in internal medicine and infectious disease, established a private medical practice called the Medical Office of Dr. Paul J. Mathieu P.C. in 2002. In late 2006 or early 2007, Defendant met Aleksandr Burman, who was looking for a doctor to see patients at his clinic in Brooklyn. Burman recruited Defendant to work at his clinic at 2647 Coney Island Avenue and agreed to pay Defendant's overhead and salary.

Beginning in 2007, Defendant helped Burman create medical professional organizations, which required a licensed physician as the owner. Defendant represented himself as the owner

---

[1] All references to rules herein are to the Federal Rules of Criminal Procedure.

when in fact Burman was the owner. For example, Defendant signed a certificate of incorporation for Sunlight Medical P.C. ("Sunlight Medical"), and identified himself as the entity's incorporator and sole shareholder, director and officer. Defendant reassigned his Medicare benefits to Sunlight Medical and signed an Electronic Funds Transfer Authorization Agreement ("EFT"), as the "Authorized/Delegated Official" of Sunlight Medical. Defendant signed similar documents for Ocean View Medical of Brooklyn P.C., representing himself as the sole owner of the corporation, when he was not the owner.

In addition to representing himself as the owner of the clinics, Defendant signed prescriptions and superbills for medically unnecessary adult incontinence supplies for patients whom he never examined. The Government presented evidence that Universal Supply Depot ("USD"), a medical supply company operated by Burman and his wife, faxed a list of patient names to the clinics on a weekly basis. Based on the USD list, the front desk receptionists at the clinics, including cooperating witness Olga Kharuk, prepared the patient charts, superbills and prescriptions for Defendant to sign. Defendant came to the clinics twice a week to sign the documents. Frequently, Defendant signed the prescriptions and either stamped or wrote the words "chux, diapers, liners, pants," and allowed the clinic staff to fill in the remainder of the prescription, including the name of the patient, date, diagnosis code, quantity of each product and number of refills. After Defendant signed the documents, the office staff delivered them to the individuals responsible for billing Medicare and Medicaid on behalf of the clinics, which then billed for the services detailed on the superbills. On the prescriptions, the clinic staff usually wrote the number "5" in the refill box, allowing USD to bill Medicaid a total of six times for each prescription. Medicaid sent Defendant a letter in 2009, informing him that he was the top-

ranked prescriber of adult incontinence products in the state of New York for the six-month period ending September 30, 2000 (the "peer comparison data").

In the aftermath of Hurricane Sandy in October 2012, the clinics closed and Medicare suspended its reimbursement payments and deactivated several of the clinics. However, the clinic at 3057 Coney Island Avenue was not deactivated until several months later. On at least three occasions in February 2013, Kharuk met Defendant at the closed clinic at 3057 Coney Island Avenue to sign prescriptions for patients on the USD list. Defendant received checks from Burman on the same days that he signed the prescriptions.

### B. Summary of Defendant's Case

Defendant testified and denied making knowingly false statements to Medicare or Medicaid, knowingly serving as the nominal or paper owner of any clinic and falsifying documents and receiving compensation for doing so. Defendant testified that he signed documents without reading them because he trusted the management at the clinics where he worked, and he had no recollection of signing the Medicare or Medicaid enrollment forms. He denied that he wrote prescriptions based on a list from USD or that he met with Burman behind "closed doors." He explained that he saw patients at the Burman clinics from 2007 until 2013 and prepared the medical portions of the progress notes, superbills and referrals and wrote prescriptions that were medically necessary based on his examination of patients or review of their charts. Defendant showed the jury several progress notes and referrals that he had completed based on his observations during patient examinations.

With respect to the number of refills listed on the prescriptions, Defendant testified that he did not write "5" in the "refill" box on the prescriptions and someone else inflated the number of incontinence products prescribed. He stated that he never received and was unaware of any

3

letter from the Office of the Medicaid Inspector General that listed him as the number one supplier of adult incontinence products for six months in 2009.

When questioned about why Defendant wrote several $9,500.00 checks, totaling $90,000.00, to Burman-owned entities in 2008, Defendant responded that a clinic administrator, Valery Volsky, directed him to write the checks because the money -- Medicare and Medicaid reimbursements -- came to his account by mistake. Defendant testified that on another occasion, Volsky directed him to sign a book of blank checks to reimburse the insurance companies, and he complied because he trusted the management.

Defendant's case also included testimony from two character witnesses and an expert witness, Dr. Richard Slutsky, a specialist in internal medicine. As relevant here, Dr. Slutsky testified that the standard of care for making a diagnosis of adult incontinence is satisfied when the patient tells a doctor that they have incontinence; a prescription for incontinence products is medically necessary if a patient complains about incontinence; and prescriptions may be properly based on a review of a patient's medical chart rather than a face-to-face visit.

## II. DISCUSSION

### A. Sufficiency of the Evidence

#### 1. Rule 29 Legal Standard

Defendant's motion for judgment of acquittal pursuant to Rule 29 is denied. Under Rule 29, Defendant must show that "no rational trier of fact, viewing the evidence in the light most favorable to the government, could have found [defendant] guilty beyond a reasonable doubt of the essential elements of the crimes charged." *United States. v. Desena*, 287 F.3d 170, 176 (2d Cir. 2002); *accord United States v. Lee*, 834 F.3d 145, 152 (2d Cir. 2016). "A defendant challenging the sufficiency of the evidence bears a heavy burden." *Lee*, 834 F.3d at 152. The

Court considers "items of evidence not in isolation but in conjunction . . . [and] defer[s] to the jury's evident assessments of the credibility of the witnesses and its resolution of the weight of the evidence." *United States v. O'Brien*, 926 F.3d 57, 79-80 (2d Cir. 2019). The Court "credit[s] every inference that the jury could have drawn in the government's favor . . . , [and] must affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt." *Id.* at 80.

### 2. The Evidence was Sufficient

Viewing the evidence presented in the Government's case in chief in the light most favorable to the Government, as required on a Rule 29 motion, a rational trier of fact could have concluded that the essential elements of the alleged substantive crimes and conspiracy charges were established beyond a reasonable doubt. Defendant's motion is accordingly denied.

An essential element of the substantive crimes of wire fraud, mail fraud and health care fraud is that the defendant knowingly and willfully participated in the scheme to defraud. *See* 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), 1347 (health care fraud); *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (mail fraud and wire fraud); *United States v. Kuthuru*, 665 F. App'x 34, 40 (2d Cir. 2016) (summary order) (health care fraud). Only this element of the charges is at issue here. The jury was instructed that the Government was required to prove knowing and willful participation beyond a reasonable doubt; and that "knowingly means to act voluntarily and deliberately rather than mistakenly or inadvertently," and willfully means "to act knowingly and with a bad purpose."

To prove the conspiracy charges, the Government was required to prove beyond a reasonable doubt that "the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *United States v. Lorenzo,*

534 F.3d 153, 159 (2d Cir. 2008) (quoting *United States v. Rodriguez*, 392 F.3d 539, 545 (2d Cir. 2004)). "[A] defendant's knowing agreement to join a conspiracy must, more often than not, be proven through circumstantial evidence." *Id.* at 161 (quoting *United States v. Nusraty*, 867 F.2d 759, 764 (2d Cir. 1989)). "Indeed, the existence of the conspiracy and a defendant's participation therein may be proven based solely on circumstantial evidence." *United States v. Siembida*, 604 F. Supp. 2d 589, 594 (S.D.N.Y. 2008), *aff'd sub nom. United States v. Price*, 374 F. App'x 189 (2d Cir. 2010) (citing *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir. 1992)).

Defendant argues that he is entitled to a judgment of acquittal because the Government's evidence at trial was insufficient to show that he had acted with the requisite intent. Defendant contends that the Government did not offer sufficient evidence that (1) he knowingly and willfully made false representations to Medicare and Medicaid; (2) he knowingly and willfully participated in the conspiracy; and (3) that the superbills are indicative of Defendant's intent. The Government's evidence was more than sufficient for the jury to conclude beyond a reasonable doubt that Defendant acted with the requisite knowledge and intent to sustain the charges.

### a. Fraudulent Misrepresentations to Medicare and Medicaid

The Government presented sufficient evidence for a reasonable jury to conclude that Defendant knowingly and willfully misrepresented to Medicare and Medicaid that he was the owner of the clinics Sunlight Medical and Ocean View. Defendant testified that he knew Burman was the owner of Sunlight Medical. The Government presented evidence that, despite this knowledge, Defendant identified himself on Sunlight Medical's certificate of incorporation as the sole shareholder, director and officer. On December 1, 2007, Defendant signed the Medicare enrollment application for Sunlight Medical, which listed only Defendant's name and

information in the section that required disclosure of any individuals with an ownership interest and/or managing control. On the same day, Defendant reassigned his Medicare benefits to Sunlight Medical and signed an Electronic Funds Transfer Authorization Agreement. In both cases, Defendant signed as the "authorized or Delegated Official" of Sunlight Medical. In May 2008, Defendant signed documents to enroll Sunlight Medical in Medicaid, including a "Disclosure of Ownership and Control" document that identified him as the sole person with ownership or control of Sunlight Medical. The evidence showed that Defendant signed Medicaid certifications as an officer or director of Sunlight Medical seven times between April 2009 and September 2012.

Defendant made similar representations to incorporate Ocean View and enroll the clinic in Medicare and Medicaid. In the Medicaid enrollment forms, Defendant described himself as the 100% owner of Ocean View, despite telling the jury that he did not own Ocean View. That Defendant was seeing patients or that he only signed the forms and did not "prepare them" has no bearing on whether he repeatedly misrepresented himself as the owner of Sunlight Medical or Ocean View.

Defendant testified that he signed the Medicare and Medicaid documents without fraudulent intent because he trusted the administrative staff at the clinic and the people from the billing company when they presented him with documents to sign. That the jury did not accept his explanation is not grounds for acquittal. *See United States v. Bonventre*, 646 F. App'x 73, 84 (2d Cir. 2016) (summary order) ("To the extent that [defendant] invites this court to re-weigh evidence, draw inferences in his favor, or re-assess credibility, the jury verdict precludes such undertakings.").

7

### b. Participation in the Conspiracy

Based on the Government's evidence, a reasonable juror could conclude that Defendant wrote prescriptions for medically unnecessary supplies for patients he never saw. The Government's cooperating witnesses Olga Kharuk and Anastasia Flora both testified that Defendant signed charts and prescriptions based on a list that USD faxed to the clinics without Defendant's seeing or examining the patients listed. The Government corroborated this testimony by presenting evidence of prescriptions signed by Defendant for incontinence products for Svetlana Tashlyk. Tashlyk testified that she visited USD -- where she believed they copied her Medicare and Medicaid cards -- but she never went to a medical clinic on Coney Island, never met Defendant nor received a prescription for adult diapers.

Kharuk also testified that in February 2013, she met Defendant "two or three times" at the clinic at 3057 Coney Island Avenue when the clinic was closed so that Defendant could sign prescriptions for the names on the USD list. To support Kharuk's testimony, the Government showed the jury stacks of prescriptions dated February 7, 21 and 28, 2013, from the meetings with Kharuk, which Defendant admitted he had signed. The Government presented telephone cell site evidence that placed Defendant in South Brooklyn for a few hours on the same days, and checks from USD signed by Burman to Defendant with the dates on the checks corresponding to the dates of the signed prescriptions. The Government was not required to produce the USD lists themselves as evidence of Defendant's fraudulent intent, as Defendant argues. Here, the witnesses' testimony, corroborated by checks, cell site data and prescriptions, was sufficient for the jury to conclude beyond a reasonable doubt that Defendant had the requisite intent.

Defendant argues that the jury could not reasonably infer Defendant's knowing and willing participation in the conspiracy because no witness testified about conversations with

Defendant after 2007 that would support that conclusion. The Government was not required to produce Defendant's admission of his knowledge of the fraud. A "jury's verdict may be based entirely on circumstantial evidence." *United States v. Rutigliano*, 790 F.3d 389, 402 (2d Cir. 2015); *accord United States v. Romano*, 794 F.3d 317, 335 (2d Cir. 2015). The jury reasonably could have based its verdict on the Government's circumstantial evidence. Kharuk testified that she witnessed Burman and Defendant meet individually more than 10 times for 30 minutes to an hour. In advance of the meetings, Burman explained to Kharuk that he needed to talk to Defendant about getting prescriptions for incontinence products and instructed her that Defendant and Burman should not be disturbed. At the end of the meetings, Burman emerged with signed prescriptions, which he sometimes asked Kharuk to deliver to USD. Considered in totality with the signed prescriptions, cell site data and other witness testimony described above, the Government's circumstantial evidence could lead a reasonable jury to conclude beyond a reasonable doubt that Defendant knowingly and willfully participated in the fraud.

Defendant argues that the cooperating witness testimony was too attenuated and weak for the jury to infer Defendant's intent, and that there was no evidentiary basis for the jury to reject Defendant's testimony and progress notes evidencing his examinations of patients from 2008 to 2013. To the extent that Defendant challenges the witnesses' credibility based on their cooperation and non-prosecution agreements with the Government, it is not the court's role to "second-guess a jury's credibility determination on a sufficiency challenge." *United States v. Florez*, 447 F.3d 145, 156 (2d Cir. 2006). The jury could reasonably credit the testimony of the cooperating witnesses over the testimony of Defendant and his expert witness. *See United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000) ("It is not for the court on a Rule 29 motion to make credibility determinations: A trial judge [is] not entitled to set aside [a] guilty verdict simply

because he would have reached a different result if he had been the fact-finder.") (alterations in original).

### c. Superbills

At trial, the Government produced superbills signed by Defendant listing dates that he purportedly provided services but corresponding to dates when he admittedly was out of the country; superbills listing dates of service when cell site data showed that he was far from the clinics in South Brooklyn; and superbills listing dates of services performed at a clinic location where Defendant admitted he had never worked. Defendant argues that the signed superbills are not indicative of his intent. Regardless of whether the superbills alone are sufficient to prove Defendant's intent, a reasonable jury could infer Defendant's knowing participation in the scheme to defraud based on the totality of the evidence -- including testimony of the cooperating witnesses, who described the process of preparing for Defendant's signature superbills, referrals, progress notes, and patient charts for patients, some of whom never visited the clinic. That the superbills were not submitted to Medicare is irrelevant; the clinics sent the superbills to billing companies that subsequently billed the Government on behalf of the clinics.

Even without the superbills, the evidence described above showing fraudulent prescriptions for phantom patients was enough for the jury to find that Defendant had the requisite intent to defraud. *See United States v. Muse*, No. 06 Cr. 600, 2007 WL 1989313, at *22 (S.D.N.Y. July 3, 2007), *aff'd sub nom. United States v. Awad*, 369 F. App'x 242 (2d Cir. 2010) ("There is no legal requirement [] that the Government prove its case through any particular means.").

B.   **New Trial**

   1. **Rule 33 Legal Standard**

Under Federal Rule of Criminal Procedure 33, a district court may "vacate any judgment and grant a new trial if the interest of justice so requires." In evaluating a Rule 33 motion, the court must "examine the entire case, take into account all facts and circumstances, and make an objective evaluation," keeping in mind that the "ultimate test" for such a motion is "whether letting a guilty verdict stand would be a manifest injustice." *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 1282 (2019). While the Court has "broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29," it must nonetheless "exercise the Rule 33 authority sparingly and in the most extraordinary circumstances." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (quotation marks omitted); *accord United States v. Bayuo*, No. 15 Cr. 576, 2019 WL 430260, at *1-2 (S.D.N.Y. Feb. 4, 2019).

   2. **The Government's Characterization of Peer Comparison Data**

Defendant's motion for a new trial based on the Government's characterization of peer comparison data is denied. The Government's statements at trial that Defendant was the "number one" prescriber of adult diapers in New York in 2009, 2010, and 2012 and number two in 2011 were not improper and, in any event, do not warrant a new trial. Indeed, Defendant *was* the top prescriber of adult incontinence products in New York in 2009, 2010 and 2012, according to state records introduced at trial and a witness from the Office of the Medicaid Inspector General.

Defendant argues that the evidence at trial showed that the clinic staff -- rather than Defendant himself -- wrote "5" on the prescription forms to indicate the number of permissible

11

refills, thus inflating the number of prescriptions actually attributable to Defendant and resulting in overstated peer comparison data. Even if the Government knew that the peer comparison data was not entirely attributable to Defendant as Defendant avers, the Government's references to the peer comparison data and "aggressive" cross-examination of Defendant based on that data were not improper. Although the clinic staff may have marked "5" on prescriptions signed by Defendant, he knowingly signed prescription forms for patients he did not examine, left the refill box blank for the clinic staff to complete, and did not check the box indicating that there should be no refills. He thereby advanced the scheme that resulted in his being the number one prescriber of adult diapers according to state records.

Nor was evidence of the peer comparison data so prejudicial that letting the guilty verdict stand would be a "manifest injustice." Defendant made similar arguments to the jury as those he makes here. The jury was free to evaluate the arguments of both Defendant and the Government, weigh the evidence and draw the inferences it thought correct. Also, as discussed above, the Government presented more than sufficient evidence that Defendant wrote fraudulent prescriptions to convict him on that basis alone. The Government did not misuse the data showing Defendant's rank among physicians statewide as a prescriber of adult incontinence products, and even if it had, there is no basis for ordering a new trial.

### 3. The Government's Cross-examination of Defendant Regarding the Employment of Valery Volsky

A new trial is not warranted based on the Government's cross-examination of Defendant regarding co-conspirator Valery Volsky. A court assessing allegations of prosecutorial misconduct should consider "the severity of the misconduct, the measures adopted to cure it, and the certainty of conviction in the absence of the misconduct." *United States v. Truman*, 688 F.3d 129, 144 (2d Cir. 2012) (alterations omitted); *accord United States v. Lumiere*, 249 F. Supp. 3d

748, 762 (S.D.N.Y. 2017). A new trial is appropriate "only when the statements, viewed against the entire argument before the jury, deprived the defendant of a fair trial." *United States v. Bermudez*, 529 F.3d 158, 165 (2d Cir. 2008).

During the Government's cross-examination, the Government asked why Defendant wrote six $9,500.00 checks on February 29, 2008, to Sunlight Management, a Burman-owned entity. Defendant explained that Volsky directed him to write the checks in February and March 2008. In response, the Government asked whether Volsky "did not even begin working for the Burman clinics until some months later." Defendant replied, "I don't recall when she started to work or even when she stopped working for Burman; but Volsky and perhaps also the billing company, WCH, gave me that instruction." Defendant now submits the affidavit of Olga Khabinskay, stating that Volsky did in fact work at the clinic as early as 2007. Defendant argues that the exchange on cross-examination prejudiced Defendant and implied that he lied when he said that Volsky directed him to write the checks.

Based on the Government's detailed analysis of the evidence as well as a confirmatory telephone call with Volsky's counsel after Defendant's testimony, it appears that the Government was correct; Volsky did not work at the clinics in February 2008. Whether or not she did, the Government had a good faith basis for asking the question, and Defendant is not entitled to a new trial. Accordingly, there is no evidence that the Government engaged in prosecutorial misconduct.

Even if the Government were incorrect about the onset of Volsky's employment, the questioning did not result in manifest injustice that would warrant a new trial. The Government was asking in substance whether Defendant had an innocent reason for writing the checks, and he replied in substance with his defense -- that one of the conspirators had instructed him to do

so, and that he unwittingly had complied. That Defendant may not have remembered after the passage of 11 years precisely who instructed him does not seem to be highly probative of his credibility. There is no reason to think that the jury's verdict was a seriously erroneous result based on this evidence.

### 4. Cumulative Effect of Prosecutorial Errors

Taken together, the prosecutorial errors that Defendant cites do not justify a new trial. "Even where individual instances of prosecutorial misconduct, 'standing alone, might not justify reversal,' a defendant is entitled to post-trial relief when the cumulative effect of the prosecutor's persistent and clearly improper [tactics] amounted to such egregious misconduct as to render [the defendant's] trial fundamentally unfair." *United States v. Connolly*, No. 16 Cr. 370, 2019 WL 2120022, at *29 (S.D.N.Y. May 2, 2019) (quoting *Floyd v. Meachum*, 907 F.2d 347, 353, 357 (2d Cir. 1990) (alterations in original)). "It is well-settled in this circuit that the effect of multiple errors in a single trial may cast such doubt on the fairness of the proceedings that a new trial is warranted, even if no single error requires reversal." *United States v. Fell*, 531 F.3d 197, 233 (2d Cir. 2008). "Nonetheless, not every error [--] whether alone or in combination with others [--] warrants a new trial." *Id.* With respect to prosecutorial misconduct, "[t]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Philips*, 455 U.S. 209, 219 (1982); *accord Connolly*, 2019 WL 2120022, at *30.

First, Defendant argues that during the redirect examination of cooperator Anastasia Flora, the Government misled the jury with respect to when Flora sent an unsolicited email to the Government. Flora testified that she sent the email after FBI Special Agent Blatt came to her home in June 2016. Flora then testified that she wrote a second email to the FBI *before* she met with the prosecutors at the U.S. Attorney's Office. The Government repeated Flora's testimony

14

in its summation, stating "[b]efore any prosecutor had ever even met with her and before she even had an attorney, she [sent an] email to the FBI agent telling him that Dr. Mathieu never ever saw any patients and that he came to the office just to sign the charts." In fact, Flora sent the second email to the FBI *after* her interview with prosecutors. Defendant argues that Flora's statement was misleading because it suggested to the jury that she sent the second email to the FBI unprompted, but in actuality she had met with the U.S. Attorney's office days prior to sending the email.

Second, Defendant argues that the Government misled the jury in summation by stating that Defendant met with Burman at the clinics behind closed doors "every week," when, in fact, Kharuk testified that Defendant and Burman met "quite a few" times and "more than ten."

The Government concedes that both of these errors occurred. Taken together, they do not constitute grounds for a new trial. *See Fell*, 531 F.3d at 209 ("[R]emarks of the prosecutor in summation do not amount to a denial of due process unless they constitute egregious misconduct."); *accord Connolly*, 2019 WL 2120022, at *26. With respect to Flora's testimony, Defendant takes issue with the implication that Flora's second email was "unprompted." Defendant, however, was not unfairly prejudiced by this implication because, after Flora was cross-examined, the Government directly asked whether anyone asked her to send the second email, and she testified that no one had. With respect to the frequency of Defendant's closed door meetings with Burman, ostensibly for the purpose of Defendant's signing fraudulent documents, regardless of how many times Defendant met with Burman, three witnesses testified that Defendant came to the clinics weekly to sign fraudulent prescriptions for patients on the USD list. The jury's verdict was thus supported by "compelling evidence," including hours of testimony from cooperating witnesses and hundreds of documents signed by Defendant in

15

furtherance of the fraud. *See United States v. Jackson*, 345 F.3d 59, 78 (2d Cir. 2003). In light of the extensive evidence offered at trial, that the prosecutors misrepresented the chronology of when Flora sent an email and the extent to which Defendant met with Burman "behind closed doors," is not so egregious as to constitute misconduct that warrants a new trial.

## III. CONCLUSION

For the foregoing reasons, Defendant's motion for a judgment of acquittal or, in the alternative, a new trial, is DENIED.

The Clerk of Court is respectfully directed to close the motion at Docket Number 657.

Dated: September 10, 2019
       New York, NY

_____
**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**